IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| JAMES FINCH | § | |
| VS. | § | CIVIL ACTION NO. 6:22cv026 |
| TEXAS DEPT. OF PUBLIC SAFETY, et al. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRTE JUDGE

Plaintiff, proceeding *pro se*, filed a complaint under 42 U.S.C. § 1983 complaining that Defendants, retired Anderson County Sheriff Greg Taylor and jail administrator Captain T. J. Choate, violated his constitutional rights while he was in the Anderson County Jail from September 18, 2018, till August 8, 2020. The lawsuit was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Before the Court is a motion by the Defendants for summary judgment on the merits of Plaintiff's claims. (Dkt. #39.) Plaintiff responded in opposition to the motion (Dkt. #42), and the parties have filed a reply and sur-reply, respectively. (Dkt. ##43, 44.) The motion is thus fully briefed and ripe for review. For the reasons explained below, the undersigned recommends that the motion be granted.

I.      **Plaintiff's Allegations**

Plaintiff's amended complaint is sworn to under penalty of perjury. (Dkt. #5 at 5.) In it, Plaintiff asserts that was booked into the Anderson County Jail as a pretrial detainee on August 8, 2018, and was held in suicide watch for thirty-six hours due to his history of suicide attempt and depression. (*Id.* at 8.) He was then moved to a "medical isolation" cell without explanation, where he stayed for approximately twenty-six months. (*Id.*) Plaintiff indicates this medical isolation was

the equivalent of solitary confinement. (*Id.*) He describes a ten-by-twelve foot cell containing a bunk, a desk, a shower, and a combination toilet/sink. (*Id.* at 10.) The only window was a four-by-twenty inch piece of glass in the steel door, which provided a view of the clinic floor. (*Id.*) Plaintiff had a telephone, but he had no one to call. The jail did not provide any books. And the cell was so airtight—having been designed for inmates with tuberculosis—that it was almost sound-proof. (*Id.*) The television was controlled by officers who frequently turned it off "without reason or explanation." (*Id.*) Plaintiff was fed in his cell through a slot in the door. He was only allowed out of his cell for rare medical appointments or twenty-minute visits from family. (*Id.*) He was also allowed out of his cell for recreation, which was in a larger cell referred to as the "gym" twenty feet away, with frosted skylights to allow for natural light but no view of the sky. (*Id.* at 10–11.) Recreation was offered five times during Plaintiff's first year in jail, but by the second year Plaintiff had lost the will to participate and simply lay in bed twenty-four hours a day. (*Id.* at 11.)

Despite Plaintiff's history of mental illness and attempted "suicide by cop," which were known to Defendants, Plaintiff was only taken to the county mental health service four times while he was in jail. (*Id.* at 11.) The mental health staff conveyed that Plaintiff's continued solitary confinement was "obviously horribly destructive" to his mental health. (*Id.*) But they said there was nothing they could do unless he were presently dangerous to himself or others because they do not provide counseling services to inmates. (*Id.*)

Plaintiff describes the "effects of such torturous solitary confinement" on him to include PTSD nightmares that would wake him from sleep, suicidal thoughts with planning and preparation, wishing to die, a temptation to plead guilty just to be moved, and deep depression. (*Id.* at 12.) He states that the conditions of his confinement caused his blood pressure to be near "stroke level" and that he had to increase from a low dose of a single medication to high doses of

three blood pressure medications. (*Id.*) The inactivity in solitary confinement caused him to develop bradycardia, which required him to get a pacemaker. (*Id.*) Despite having no heart problems before his incarceration, he has also had to have three stents implanted in his heart. (*Id.* at 13.) Upon his release he could not walk twenty feet without becoming winded, and he still cannot walk far. Plaintiff developed diabetes in solitary confinement. He is now uncomfortable in open spaces and crowds. His PTSD and depression, which were under control before, are now so severe that he "cannot function in life." (*Id.*) He has been unable to work since his release and is the object of pity in his family. Plaintiff attributes all these effects to his solitary confinement in the Anderson County Jail, because he previously served eight years in the Texas Department of Criminal Justice "and suffered not a single ill effect." (*Id.*)

Plaintiff states that he was not given any reason for his isolation until a year after he was booked, when Defendant Choate told him that the jail's regular cells do not have electrical outlets for Plaintiff's CPAP machine. (*Id.* at 8.) Plaintiff spoke with Defendant Choate six times and Defendant Taylor at least twice during his incarceration about the "negative effects" of his solitary confinement on his mental health. (*Id.* at 8–9.) Both men blamed the lack of electrical outlets in the regular cells and told Plaintiff that he could be held in his medical isolation indefinitely. (*Id.*) Defendant Taylor repeatedly just waved Plaintiff away, refusing to speak to him, and laughed at him at least once. (*Id.* at 9.) Defendant Choate informed him that there were eight pretrial detainees in solitary at that time due to their need for electrical outlets for CPAP machines. He stated he believed the inmates' rights were being violated and that the Sheriff would not approve the expense of adding electrical outlets to the regular cells. (*Id.*) Plaintiff says there were no periodic reviews of his housing placement, and even his clean conduct record could not earn him a release from solitary confinement. (*Id.* at 7.)

Plaintiff claims that Defendants' treatment of him was for no legitimate governmental reason, deprived him of protected liberty interests and the "minimal civilized measures of life's necessities," denied him needed psychiatric care, posed a substantial risk of harm, shocks the conscience, constituted punishment without conviction of any crime, and violated his procedural and substantive due process rights, all in violation of the Fifth, Sixth, and Fourteenth Amendments. (*Id.* at 6–8.) He seeks $20 million in compensatory damages, $20 million in punitive damages, and an injunction prohibiting the automatic housing of CPAP-dependent inmates in solitary confinement. (*Id.* at 4, 14.)

## II.    Defendants' Motion and Supporting Evidence

Defendants assert that there were multiple, legitimate governmental reasons to house Plaintiff in a single cell and that his housing assignment did not constitute deliberate indifference to a serious risk of harm to him or unconstitutional punishment. They rely on the affidavit of Defendant Choate, who is a captain in the Anderson County Sheriff's Office and a jail administrator. (Dkt. #39-1 at 1.) He testifies to Defendants' factual assertions as follows:

> "Plaintiff was booked in the Anderson County Jail on August 3, 2018, on two felony charges of failure to comply with sex offender requirements. Exhibit A-2. During intake, Finch informed jail staff that he required the use of a BiPAP (bilevel positive airway pressure) machine to help him breathe in his sleep, and that he took blood pressure medication. *Id*. Mr. Finch refers to his breathing machine as a CPAP, so I will refer to it as a CPAP machine in this affidavit. Finch's CPAP machine required an electrical outlet to work, and made a loud noise when turned on."

> "For multiple reasons, the Anderson County Jail does not permit inmates who require a CPAP machine to be housed in general population. One, because the CPAP machine is to be used at night, and it makes a loud noise, it is possible the machine would disturb other inmates as they slept. In my experience, such a disruption often leads to arguments and fights among the inmates. Two, the CPAP machine requires electricity to operate. Having an electrical cord present in a group cell is a safety concern associated with accidents, such as tripping, and intentional acts of violence. Three, the population group cells in the Anderson County Jail are not fitted with electrical outlets."

"Some of the single inmate cells in the Anderson County Jail are fitted with electrical outlets. In order to accommodate Finch's medical needs, he was housed in an individual cell that was fitted with electrical outlets. His cell also had its own single bed, desk, television, shower, toilet, sink and phone. Although Plaintiff was housed in a single cell, he had access to the same activities, commissary, meals, and recreation as the inmates housed in general population. Plaintiff was permitted to leave his cell and interact with other inmates. Specifically, Finch was allowed exercise periods, recreation, visitors, and was not otherwise denied any right or privilege on the basis that he was housed in a single cell for medical reasons. The decision to place Finch in a single cell was not made for punishment or retaliatory purposes. The decision was made so that Plaintiff's medical needs (use of a CPAP machine) could be accommodated."

"Finch was deemed high risk at booking, and was classified at the maximum custody level on all of his custody reassessments throughout his incarceration, primarily due to the serious offense history and the severity of his current offenses. Further, on the Custody Reassessment Scale Forms, the reason for reassessment was noted as "sep" (i.e., that Finch was being housed in a separation cell), and on all forms but one, medical was noted as a "special managed concern." Finch's classification was reassessed every 30 days, as required by Texas Jail Standards. The Anderson County Jail does not have solitary confinement like you see on television. The Jail's single, or separation, cells are in the main part of the Jail, have windows on the doors, and are set up to maximize the ability of the jailers to monitor and interact with the inmates housed in those cells."

"Finch was released from the Anderson County Jail on September 18, 2020. During his period of incarceration at the Anderson County Jail, Finch filed a large number of grievances, service requests and health service requests, however, none of them related to the allegations in his amended complaint - that he was held in solitary confinement for months against his will, or that his mental health was being negatively impacted as a result of his living in a single cell. Finch did not request to be removed from his single cell, or to have more time outside of his single cell or around other inmates, in any of the Grievances or Service Requests he filed during his period of his incarceration."

"Finch had multiple mental health evaluations through ACCESS while incarcerated at the Anderson County Jail. The ACCESS records contain no record of Finch ever requesting to be moved out of the single cell and no record alleging being housed in a single cell contributed to his psychological and depression issues. In sum, there is no record in Finch's jail or medical files over his entire period of incarceration at the Anderson County Jail where he complains of being in a single cell, not being allowed to leave his cell, requesting to be placed in general population or to have more time around other inmates. In my experience, most, if not all, inmates would prefer being housed in a single cell with his own shower, toilet, television, and phone, and would view it as a privilege, not a punishment. Housing inmates who required CPAP machines in single cells serves the legitimate governmental interest of allowing those inmates to have electricity for their medically necessary machines, to not disrupt other inmates while the machine runs at night, and to

ensure the safety of all inmates. Attending to the medical needs of inmates is inherent to operating a jail in a manageable and constitutionally permissible fashion. The Anderson County Jail complies with Texas Jail Standards' instruction and requirements related to medical issues, such as this and provided Mr. Finch with his medical device in a safe environment."

"Even if Finch did not require the use of a CPAP machine, he would have still been properly housed in a single cell because he is a former law enforcement officer. For the safety of the inmate, it is our policy that all former law enforcement officers are housed outside general population in single cells."

(Dkt. #39-1 at 3–5.)

Attached to Defendant Choate's affidavit are authenticated copies of relevant jail records that Defendants maintain support their asserted facts. First, Exhibit A.1 to the affidavit is a collection of twelve inmate grievances submitted by Plaintiff during his incarceration, dated from March 14, 2019, to September 17, 2020. [1] (Dkt. #39-2.) None of these grievances pertain to Plaintiff's cell assignment or current psychological distress. (*Id.*) One grievance, submitted on June 23, 2020, to complain about a six day delay in responding to Plaintiff's sick call request about acid reflux, does mention his mental health:

The nurse accused me of "threatening" her simply for complaining that six days had elapsed with no reply to a sick call for my acid reflux. Additional she has twice refused to give me her name & job title. She has become so hostile she ignores me when I ask for help. I have extreme hypertension, a serious heart condition and psychological diagnosis of depressive disorder & PTSD, what if I were having chest pains or depression problems? Would she simply ignore me?

(*Id.* at 9.) The response to that grievance says that "Offender has talked to the Captain & the issue has been resolved." (*Id.*)

Exhibit A.2 to Choate's affidavit is the 2-page record of Plaintiff's booking on August 3, 2018, and his release on September 18, 2020. (Dkt. #39-3.) At the time of his booking, his height

---

[1] Several of the grievances submitted were filed by a John Finch, rather than Plaintiff. (*See* Dkt. #39-2 at 14–16.) Elsewhere in the record, John Finch is identified as Plaintiff's brother, who has also spent time in the Anderson County Jail. (Dkt. #40-1 at 6.) The Court presumes these grievances were submitted by mistake, and they play no role in this analysis.

was recorded as 5'10", and his weight was 325 pounds. (*Id.* at 1.) Those figures were unchanged on his release report. (*Id.* at 2.)

Next, Defendants attach Exhibit A.3, which comprises twenty-six Custody Reassessment Scale forms for Plaintiff. (Dkt. #39-4.) The first form is dated August 30, 2018, and the last is dated August 31, 2020. Between those first and final reassessments, interim reassessments were dated at approximately one-month intervals on October 1, 2018, October 30, 2018, November 29, 2018, December 31, 2018, January 30, 2019, February 28, 2019, March 28, 2019, April 30, 2019, May 29, 2019, July 1, 2019, July 30, 2019, August 29, 2019, September 30, 2019, October 30, 2019, November 30, 2019, December 30, 2019, January 30, 2020, February 28, 2020, March 31, 2020, April 30, 2020, May 29, 2020, June 30, 2020,[2] and July 31, 2020.[3] Each form scores Plaintiff as a maximum custody offender and checks "medical" as a "special managed concern." (*Id.*)

Plaintiff's service and health service requests, along with his medical logs, are filed under seal as Exhibit A.4. (Dkt. #40-1.) The written requests range from orders for thermal underwear and an absentee ballot application to requests for regular library time and other legal information. None of the requests concern Plaintiff's cell assignment or psychological distress. The medical logs begin on August 3, 2018, when Plaintiff was seen for initial evaluation and reported that he "wears a BI PAP." (Dkt. #40-1 at 22.) It reflects regular blood pressure checks thereafter, medical efforts to control Plaintiff's high blood pressure and acid reflux, and other routine medical and dental care. A sick call note dated June 13, 2019, provides "follow up for pacemaker placement

---

[2] For reasons not explained in the record, two separate reassessment forms appear to have been filled out for Plaintiff on June 30, 2020. (Dkt. #39-4 at 3, 21.) The forms are signed by different people but reflect the same information and reach the same result: maximum custody with medical managed concern. (*Id.*)

[3] The July 31, 2020 form appears to be a re-use of the April 30, 2020 form. (Dkt. #39-4 at 2, 5.) The stamped April date is crossed out on both forms, and the July date is handwritten on the second form. The remaining marks on the forms, however, are clearly different, and the forms are signed by different people. (*Id.*)

complete, new medications added as directed." (Dkt. #40-1 at 18.) On June 20, 2019, Plaintiff reported to medical staff that he would like to speak with ACCESS. (*Id.*)

Plaintiff's ACCESS mental health records are included as Sealed Exhibit A.5. (Dkt. #40-2.) During his initial intake assessment on August 3, 2018, Plaintiff reported that that he had received mental health services before, his last appointment in ACCESS being eighteen months earlier, that he had previously attempted suicide, and that he had diagnoses of PTSD and major depressive disorder. (*Id.* at 4.) He said he had felt depressed "a little bit" even before his arrest, due to his "chronic depression." (*Id.*) Plaintiff also reported that he was being treated for hypertension and that he sometimes had flashbacks to cases he had worked as an investigator. (*Id.* at 5.) He reported being on amlodipine, doxazosin, prozac, and prilosec. (*Id.*) Plaintiff reported that he had gained at least five pounds in the last few weeks without trying. (*Id.* at 4.) He was observed at that time to have no signs of depression or mental illness, and it was recommended that he be released from suicide watch. (*Id.* at 2, 4.)

A diagnostic review performed on September 10, 2019, incorporated notes from Plaintiff's previous visit on March 15, 2016, years before this incarceration. (Dkt. #40-2 at 16.) At that time, he had reported symptoms of major depressive disorder, recurrent, including irritable or depressed mood, isolation, sleep disturbance, psychomotor agitation, recurring thoughts of death without active suicidal ideation, PTSD related to the trauma of a past case, including "nightmares, intrusive memories, maladaptive thinking about the problem, mood problems/irritability, hypervigilance, irrational fear, [and] possible dissociation." (*Id.*) Plaintiff described himself as a "violent parolee" and said his "psychiatric issues keep getting in the way." (*Id.*) The review also incorporated an earlier note from March 15, 2016, indicating that Plaintiff reported he had high blood pressure, prostate issues, chronic arthritis, and a neck injury. (*Id.*) Plaintiff reported "having depression his

8

whole life," including times when he "was not moving or doing anything." (*Id.* at 19.) He also reported past alcohol abuse "to deal with his PTSD symptoms," but said he had been sober since 2006. (*Id.* at 20.) Plaintiff also shared that his father had PTSD and drank six beers a day, and his brother abused drugs and was in treatment for depression and mood swings. (*Id.* at 21.) The result of the 2019 review was that Plaintiff was recommended to receive "psychiatric services and medication management." (*Id.* at 24.)

The following summary of Plaintiff's history, condition, and complaints was made on November 12, 2019:

TYPE: Client Assessment    Medicaid:    Date: 11/12/19

**PSYCHIATRIC EVALUATION**

SOURCE: Information for this evaluation was obtained from face to face interview with client, review of previous psychiatric evaluation dated 3/3/2016, and intake records.

CHIEF COMPLAINTS: "Bridget helped me with PTSD in 2016; I hope to get back into counseling with her"

HISTORY OF PRESENTING ILLNESS: This patient is a 51-    year old divorced Caucasian male who has a previous diagnosis of Major depressive disorder and post-traumatic stress disorder; he presents today for psychiatric evaluation to resume mental health services and medication management of depressive and PTSD symptoms. James is escorted from Anderson County jail by Officer Peterson.

James reports having depression his whole life; his first treatment was in 2000 when he was hospitalized for depression and suicidal ideation; he continued his treatment at Andrew's center. He reports that he became very depressed and suicidal due to  he was abusing alcohol and having difficulties with his wife. He has been diagnosed with severe PTSD and major depressive disorder. He had traumatic experience in 2003 after seeing the aftermath of children stoned to death by their mother when he was a police officer and started having symptoms of PTSD; he drank heavily to cope with his symptoms. He was treated briefly by Andrew Center and he stopped going. He went to prison from 2006 to 2016 because he got drunk and physical and sexually assaulted his wife and attempted to murder of a police officer.  He was not treated while in prison.  He reports that the trauma counseling he received at ACCESS in 2016 through Bridget helped him greatly; he reports that he is in jail currently since 8 months because he tried to keep his ex-daughter in-law who remarried to a child molester from getting custody of his grandson; the situation involves a child's safety and that has brought back his PTSD symptoms and he came back to ACCESS mainly so he can get counseling through Bridget. He reports that he continued taking his antidepressant through his PCP when he left ACCESS at the end of his counselling. He has been taking Prozac for 2 to3 years. He reports few depression symptoms such as low motivation and anhedonia; he sleeps well, coping well with anxiety; his appetite is decreased, but that is "due to jail food" and he is usually fatigued due to heart problems. He reports that PTSD is the one he is having issues with.  He reports that nightmares are not as bad as they used to be; he is having exaggerated startle reflex, anger toward people that hurt children, irrational fears about his grandchildren's safety, intrusive thoughts, and flashbacks.  He denies psychosis and SI/HI.

*Continued*

He wants to continue taking Prozac at 40 mg; he is not open to dose increase or addition of any medications. He wants counseling and referral will be sent to TT for PTSD counseling. He will continue Prozac at 40 mg q A.M. Lab work will be requested on his next appointment. He agrees to this plan of care and verbalized understanding.

PSYCHIATRIC HISTORY He was hospitalized at PRMC in 2000 for suicidal thoughts and major depression, He had suicidal thoughts in the past and one attempt in 2006 to "suicide by cop" but none since then; he reports he gets too depressed to even want to kill himself, it seems like it's too much effort; he denies current suicidal thoughts and denies any current homicidal ideations.   He has received mental health services at Andrew's center twice, once at ACCESS, and he continued getting prescription of his Prozac from his PCP after he stopped coming to ACCESS. He reports he takes Prozac. He reports that Prozac 40 mg has been effective for him for 2 to 3 years. He wants to continue with Prozac.

SUBSTANCE USE HISTORY
He has no h/o  using illicit drugs. He reports that he used to abuse alcohol, but has been sober since his offense in 2006. He never smoked cigarettes.

~~offense in 2006. He never smoked cigarettes.~~

SOCIAL HISTORY
He reports that he was raised by his mother and father together. He is in Anderson county jail county currently, but used to live in his own home on the same property with his parents. He was married once and is divorced. He has 2 sons and has good relationship with both sons, one lives in Athens. His older son has a young child and James sees him every other day; James feels like his grandson is his light and he survives for him.  He has one brother. He has HS and some college he reports that he has been unemployed since 2006 when he got incarcerated. He reports he is back in jail because he  violated parole as an ex-sex offender (sexually assaulted his wife) who did not report 3 email addresses.

TRAUMA
James denies h/o physical, verbal or sexual abuse, but he experienced many traumatic experiences while working as a deputy sheriff investigating crimes against children; he has PTSD from experiencing traumatic deaths of children in his line of work.

FAMILY PSYCHIATRIC HISTORY
He reports that his brother has major depression and has attempted suicide; his father has Alzheimer disease.

PAST MEDICAL HISTORY
He reports h/o high blood pressure, prostate issues, acid reflux, arthritis, and neck injury. Denies any h/o head injury; he reports h/o seizures, but he has not had any seizure in the past three years. He takes Prilosec, Flomax, amlodipine, and clonidine. De reports no known drug allergies. Dr. Howell is his PCP.

PAST SURGICAL HISTORY
He reports h/o right rotor cuff repair, sinus surgery and pacemaker placement.

REVIEW OF SYSTEMS
General/Constitutional: denies insomnia. Psychiatric: Denies mania or hypomania. HEENT: Denies blurry vision. CV: has pacemaker due to bradycardia, denies palpition. RESP: No breathing difficulties. GI: has no gastrointestinal disturbance. MSK: Denies joint pains. Neurological: denies HA, seizures, or tremors

OBJECTIVE

Vital Signs: BP is140/81. Pulse is 74. Weight is 289Lbs.  BMI is 42.7

MENTAL STATUS EXAMINTION:
The client is alert and oriented to person, place, and time. Gait is shuffled due to bilateral ankle chains and hand cuffs.  Appearance: patient wearing jail garment. Client is neatly groomed. Behavior is cooperative. Mood is dysphoric. Affect is mood congruent. Speech is coherent with normal rate and tone. Psychomotor activity is

Continued

relaxed and calm. Attention and concentration is focused. Thought process is goal-directed. Thought content is free of SI/HI, paranoia, delusions and obsessions. Perception is without auditory and visual hallucinations. Insight and judgment are fair.

ASSESSMENT:
Major depressive disorder, recurrent, moderate
Post-traumatic stress disorder, unspecified
Psychosocial: Health problems and legal issues

PLAN:
Continue Fluoxetine 20 mg, 2 caps PO Q A. M. #60 (PAP)
REFERRALs: Referral for PTSD counseling
LABS: Request lab draw on next appointment.
Return to clinic in 8 weeks for medication management.

EDUCATION
Medication teaching about the current regimen reviewed particular to purpose, potential side effects and expected benefits and relative risks of medication use.
Instruction to report any problematic medication side effects promptly reviewed
Encouraged medication compliance and to keep scheduled appointments.
Health promotion counseling provided with focus on weight control through increased exercise and activity, healthy dietary choices and decreased sugar intake.
Accessing the clinic and crisis hotline phone numbers was reviewed.
 The client was mutually involved in the development of this plan of care, verbalized understanding of these treatment plan instructions, and was provided the opportunity to ask questions.

(Dkt. #40-2 at 38–40.)

Plaintiff's treatment with fluoxetine, 20 mg twice a day, was thus continued on that date for depression, decreased energy, anger and irritability, PTSD/nightmares, which were reported to be "significantly decreased." (Dkt. 40-2 at 10, 28.) He was also given an "Educational BMI handout" along with counseling on exercise and nutrition as part of a BMI screening follow up, presumably due to his reported weight of 289 and BMI of 42.7. (*Id.* at 27, 39.)

The same treatment was again continued on February 20, 2020, for a similar list of symptoms: depression, low motivation, anger/irritability, PTSD/nightmare, hypervigilance, and irrational fears. (*Id.* at 11, 32.) He reported on that date that "my depression increased a little, but it is situational." (*Id.* at 41.) Specifically, the provider observed as follows:

> James reports that he is taking his Prozac 40 mg and that it [is] still effective for him. He reports that his depression has increased a little because he has been living in his jail room for 2 years waiting for a hearing or trial and still has not heard anything and do not knowing [sic] what will happen. He does not want any increase

11

> in his medication because dose increase causes him increased dry mouth. He thinks ACCESS could not provide the trauma counseling he requested for [sic] because the[y] do n[ot] provide counseling to jail inmates. [H]e denies hopelessness and has no SI/HI.

(*Id.*) Plaintiff denied mania, hypomania, blurry vision, heart palpitations, breathing difficulties, gastrointestinal disturbances, or joint pain. (*Id.*) He had a pacemaker due to bradycardia, and his weight was 289 with a BMI of 42.7. (*Id.* at 41–42.) His blood pressure was 140/81, and his pulse was 74. (*Id.* at 42.)

On July 22, 2020, Plaintiff's prescription was renewed for fluoxetine, 40 mg once a day. (Dkt. #40-2 at 14, 35.) His target symptoms were again identified as depression, low motivation, anger/irritability, PTSD/nightmare, hypervigilance, and irrational fears. (*Id.*) The provider observed that

> James reports that he did not request this follow-up and he was just told a few minutes ago that he needs to speak with the provider at ACCESS. He says that he takes his Prozac 40 mg as prescribed and it has been helping with his depression; no issues with insomnia and no worsening of his symptoms, but he is still depressed and feels frustrated and it is not something medication can fix because it is situational; he says he has been in jail for 2 years and even after going to court on 7/9/2020, he still does not have a trial date due to Covid-19. He does not want any medication adjustment or changes. He does not want any increase in his Prozac because dose increase causes him increased dry mouth and he says, "There is so much that medication can do." He reports that he is depressed and has PTSD and counseling is what helped him the most in the past, but counseling is not being offered to him while [in] jail. He denies hopelessness and has no suicidal or homicidal thoughts. He continues to take Prilosec, Flomax, amlodipine, and clonidine for h/o acid reflux, prostate issues, and high blood pressure. No new medical concerns reported.

(Dkt. #40-2 at 43.) Plaintiff again denied mania, hypomania, heart palpitations, cough or breathing difficulties, gastric upset, or joint pains. (*Id.*) The provider found his mood to be dysphoric and frustrated, but that his speech was coherent and normal, he was calm, his attention and concentration were normal, his memories were intact, and his thought process was linear and organized. (*Id.* at 44.) His insight and judgment were deemed good. (*Id.*)

Defendants assert that Plaintiff cannot establish any action by either of them that violated the Constitution and that, even if he could, they would be entitled to qualified immunity because their conduct was objectively reasonable in light of clearly established law. (Dkt. #39 at 2.) Specifically, they argue that "[t]here is no constitutional right, let alone a clearly established one, that pretrial detainees be housed in general population" or that "general population cells be fitted with electrical outlets." (*Id.* at 14–15.) It is their position that keeping Plaintiff in his single cell— rather than demonstrating deliberate indifference to his serious needs—"preserved Finch's right to medical care" by enabling the use of his medically-prescribed CPAP machine. (*Id.* at 15.) They also assert that the effective management of jails is a matter within their professional expertise and that they have a legitimate governmental interest in placing inmates who require CPAP machines in single cells, where they have electricity to power the machines and will not disturb or endanger other inmates. (*Id.* at 16.) Finally, they argue that even if the Court finds a constitutional violation in this case, it is not clearly established by the existing law of this Circuit. (*Id.* at 17.) Accordingly, Defendants say they are entitled to qualified immunity. (*Id.*)

## II. Plaintiff's Response

In his response, Plaintiff emphasizes his history of mental health troubles before his stay in the jail. He highlights portions of the ACCESS records described above, which include his reports of work-related trauma before his incarceration, and points to evidence that Defendant Choate was copied on an email about Plaintiff's screening form, which mentioned his history of chronic depression, hypertension, PTSD, and suicide attempt. (Dkt. #42-7 at 11.) Plaintiff also attaches law enforcement records, including a report he made as an officer on May 10, 2003, in which he described his discovery of the bodies of three young children, two of whom were deceased, with massive head wounds inflicted by their mother with rocks. (Dkt. #42-8 at 2–3.)

Plaintiff stresses the Defendants' "direct personal knowledge" of his previous suicide attempt, which was witnessed by Defendant Taylor and was the topic of much conversation and concern from Defendant Choate. (Dkt. #42 at 2.) He argues that this personal knowledge disentitles Defendants from qualified immunity. (*Id.* at 3.) He attaches a 2006 Anderson County police report establishing Taylor's presence during what Plaintiff refers to as his attempted suicide, and an affidavit from Todd Tatum about a conversation he had with Choate about Plaintiff's psychological condition. (Dkt. ##42-1, 42–3.) Specifically, the affidavit provides that:

> On the day James Finch was released from Anderson County Jail I waited for over an hour for his release. During this time I was approached by Captain Choate. He wanted to express his admiration and respect for James. We talked about James PTSD and his depression. Captain Choate said he felt sorry for him but that the staff was caught in a weird position. I didn't know really what that meant at the time. He told me that he would sit with James at nights to try and help him because he knew how bad his depression was and that they were concerned about him. He also said there was another jailer that would sit with him and watch him at nights. We discussed James background and what had led him there. He was clearly aware of James previous suicide attempts and that he had ptsd and that he suffered from severe depression.

(Dkt. #42-1 at 1.) An affidavit by Jessica Tatum corroborates that Todd Tatum had a lengthy conversation with Choate on the day of Plaintiff's release. (*Id.* at 3.)

Also among Plaintiff's exhibits, but not attached to Todd Tatum's affidavit or any other authentication, are three letters from Plaintiff to "Todd" dated April 24, 2020, July 10, 2020, and July 31, 2020. (Dkt. ##42-4–42-6.) These letters include a single highlighted reference to Plaintiff's "2 years in solitary now," and one statement that "when I get depressed it just eats on me." (Dkt. #42-4 at 1; Dkt. #42-6 at 1.) The July 10 letter contains the most substantive discussion of any mental health trouble:

> Last night was a bad night. Maybe the worst yet. I have major depressive disorder and severe PTSD. Individually they're both bad enough but together they have a

> synergy. The more depressed you get the more the PTSD acts up. And the more it acts up the more depressed you get. And on & on it goes. I was so bad this kid who works here actually came in and sat with me a while to make sure I was OK. That's a weird thing about this jail. The Sheriff and administration is the most corrupt I've ever <u>seen</u> (and I worked for fucking J.B. Smith) yet the actual jail staff is some of the best I've ever seen. The captain, sergeants and kids who work here are all really nice people who really seem to care. They don't approve of the shit going on but the[y] have no power.

(Dkt. #42-5 at 2.) A letter dated July 31, 2020, references Plaintiff's inability to find a job after his previous release from prison, saying that it "was driving [him] fucking crazy" and "was crushing to [his] self esteem." (Dkt. #42-6.)

Plaintiff highlights some of the grievance records filed by Defendants to emphasize two instances in June 2020 when he complained about a delay in addressing his sick call request for acid reflux and increasing his Prilosec dosage. (Dkt. #42-7 at 1–2.) In one of those grievances, quoted above, Plaintiff mentioned his psychological diagnoses and expressed concern that those might also be ignored at some point. (*Id.* at 1.)

Plaintiff argues that Defendants' treatment of him, particularly with respect to denying him outdoor recreation for twenty-seven months, violated his rights under the Eighth and Fourteenth Amendments. (Dkt. #42 at 4.) He also argues that, even in the absence of any records that Plaintiff requested additional mental health care or to be moved out of solitary confinement, that jail officials are under obligation to act when they "know or should know of a particular vulnerability to suicide of an inmate." (*Id.* at 7 (quoting *Palakovic v. Wetzel*, No. 3:14-145, 2016 WL 707486, at *5–8 (W.D. Pa. Feb. 22, 2016)).) He asserts that Defendants clearly fall into that category in light of the voluminous records establishing that his history of mental health issues was known to them. (*Id.* at 6–8.)

Plaintiff also addresses Defendants' factual assertions. He says the assertion that his CPAP machine made a loud noise is "simply untrue." (Dkt. #42 at 11–12.) He observes the absence in

Defendants' exhibits of any report that there has ever been an inmate fight over CPAP machine noise and states that no such fight could have ever happened because inmates using CPAP machines have always been held in solitary since the Anderson County Jail opened. (*Id.* at 12.) And he says that even if such fights would otherwise occur, they could be "avoided simply by confining all the CPAP people together in the same eight-man cell." (*Id.*)

Plaintiff says the failure to equip one of the eight-man cells with electrical outlets to accommodate CPAP-dependent inmates was an oversight by the jail designers, and placing outlets in the solitary cells was an "afterthought," a decision made upon completion of the jail. (*Id.* at 12–13.) Plaintiff asserts that he learned from conversation with Defendant Choate that the jail has a capacity of around 300 inmates and typically operates at about fifty percent capacity, including eight to ten inmates who require CPAP machines. (*Id.* at 13.) Those inmates are "confined to solitary for months if not years at a time." (*Id.*) Plaintiff also suggests that Defendants' asserted danger associated with the electrical cords for CPAP machines is a red herring, because "[e]ach inmate requiring a CPAP machine is constantly exposed to such 'dangers,' whether confined in an eight-man cell with others requiring a CPAP machines [sic] or in Solitary," and an inmate who sustains an injury caused by an electrical cord would be more likely to obtain timely help if he were surrounded by other inmates rather than alone and unconscious. (*Id.*) Plaintiff argues that equipping the solitary cells with outlets was simply "cheaper and easier," without any compelling governmental reason. (*Id.* at 13–14.) And he says that the isolation is "torturous and punishing," and that around half of all suicide attempts in the jail occur in those sixteen solitary cells. (*Id.* at 13-14.)

Plaintiff also contests Defendants' reliance on the seriousness of his criminal history to justify housing him in a single cell. He acknowledges that his 2006 offense, including an assault

on his wife, was "a terrible and shameful thing," but he states that it was "a single night over sixteen years prior" to this incarceration and that it happened at a time when he was "suffering from PTSD, Depression and was heavily intoxicated." (Dkt. #42 at 14–15.) And he asserts that his new offense—failing to comply with sex offender registration requirements—was simply "nonviolent paperwork violations." (*Id.* at 15.)

Similarly, Plaintiff disputes Defendants' assertion that his being a former law enforcement officer played any role in his cell assignment. He says he had been out of law enforcement for over sixteen years at the time of this incarceration and observes that the need for protective custody is not mentioned anywhere in the records submitted by Defendants. (Dkt. #42 at 15–16.)

Plaintiff disputes the Defendants' characterization of life in his single cell as "flatly deceptive." (Dkt. #42 at 16.) He asks the Court to visit the jail to see "the conditions under which he suffered for over two years." (*Id.*) He describes "twenty-four-hour, seven day a week confinement in a room the size of a walk-in closet," receiving food through a "Bean Chute," with no exposure to fresh air or sunshine except during transportation to a doctor or court. (*Id.*) He complains of the lack of counseling services. (*Id.*) He denies Defendants' assertion that the solitary cells are in the main part of the jail and have windows in the doors, asserting that solitary and medical cells are in a separate part of the building from general population, and the only thing visible through the windows in the doors is blank wall and four feet of empty corridor. (*Id.*) He says that "'Recreation' simply consisted of being taken to a larger, empty, indoor concrete box, usually alone with no exposure to either sunlight or fresh air." (*Id.* at 17.) He says that "at first," he was taken to recreation once or twice a week, but "[b]y the end," his depression and PTSD were so severe that he had no energy to go to recreation and would go days without even showering.

(*Id.*) He spent "approximately the entirety" of his last year in jail barely being able to get out of bed, and he developed a bed sore on his left foot. (*Id.*)

Plaintiff explains the absence of grievances about solitary confinement or mental health troubles by pointing to a grievance in Defendants' records in which he states that medical is "just throwing them away" when grievances are sent to them. (Dkt. #42 at 17.) He also says he had never seen an inmate handbook containing the grievance procedure until Defendants filed it in this case, because while he was in jail he was told no copies were available. (*Id.* at 19.) And he says he never asked the ACCESS staff to move him out of solitary because they did not have the authority to do so. (*Id.* at 20.) He points to one instance in which ACCESS staff recorded that Plaintiff said "who wouldn't be depressed?" as a result of being in solitary confinement. (*Id.*)

Plaintiff says he "intends to summon" a number of past and present jail staff, family and an ACCESS employee who will testify about Plaintiff's "mental health and suffering," the lack of counseling for jail inmates, and his elevated blood pressure, which a witness told him was connected to the length of his stay in solitary. (*Id.* at 18–19.) He says he needs discovery to obtain the contact information for the relevant past and present jail staff who could testify to these facts. (*Id.* at 19.)

Plaintiff also complains in his response about alleged "overcharging" in his 2006 criminal case and conveys hearsay attributing that overcharging to Defendant Taylor's desire to "bury" Plaintiff. (Dkt. #42 at 15.)

### III. Defendants' Reply

Defendants argue in reply that Plaintiff's focus on his 2006 attempted "suicide by cop" is irrelevant to the issues raised in their motion: "Whether Plaintiff tried to commit 'suicide by cop' 12 years prior to the incarceration at issue in this case, has no impact on whether his housing in

2018 was constitutional." (Dkt. #43 at 2.) They reiterate that Plaintiff responded "no" when asked during his booking whether he was thinking of killing or injuring himself and that he continued to deny thoughts of suicide or self-harm during subsequent evaluations by jail and ACCESS staff. (*Id.*) "As a result, suicidal ideation was not a factor considered when housing Plaintiff in 2018." (*Id.*) Rather, "chief among Defendants' reasons for housing Plaintiff in a separation cell was [that] general population cells were not outfitted with electrical outlets needed to power Plaintiff's medically-necessary CPAP machine." (*Id.*) In response to Plaintiff's assertion that it would have been possible to have created a CPAP-accessible shared cell, Defendants assert that such a cell is not required by law, and the county did not have the resources to construct one. (*Id.* at 2–3.)

Moreover, Defendants assert that jail policy would have resulted in Plaintiff's housing in a separation cell even if a general population cell could have accommodated his CPAP machine, because he is a former law enforcement officer. (Dkt. #43 at 3.) They argue that this policy is in accordance with TEX. ADMIN. CODE § 271.1(a)(11), which authorizes the "administrative separation" of inmates who require protection. (*Id.*) Defendants assert that the length of time since Plaintiff last served as a law enforcement officer does not affect their application of that policy. (*Id.* at 4.)

Defendants object to the affidavits submitted by Plaintiff as inadmissible hearsay under Rule 801(c) of the Federal Rules of Evidence. Additionally, they argue that the affidavits merely establish that Defendant Choate "looked after Plaintiff" while he was incarcerated and do not establish unreasonable behavior by Defendants or otherwise create any genuine issue of material fact. (Dkt. #43 at 4.)

Finally, Defendants distinguish the case law relied upon by Plaintiff and argue that even if it were not distinguishable, it would not form the clearly established law for the purposes of this case:

> Plaintiff cites *Palakovic v. Wetzel*, a Western District of Pennsylvania case, to support the proposition that "if such officials know or should know of a particular vulnerability to suicide of an inmate, the Fourteenth Amendment imposes upon them an obligation not to act with reckless indifference to that vulnerability." Docket No. 42 at 7; *Palakovic v. Wetzel*, No. CV 3:14-145, 2016 WL 707486, at *4 (W.D. Pa. Feb. 22, 2016), *vacated in part*, 854 F.3d 209 (3d Cir. 2017). *Palakovic* involves an inmate with mental health/personality disorders who was housed in solitary confinement. The facts of *Palakovic* differ significantly from this case. First, Palakovic attempted suicide less than a year prior to his arrival at the corrections unit, stated he had current thoughts of self harm and suicide and indicated he had plans to kill himself. Further, the defendants in *Palakovic* did not take reasonable measures to prevent Palakovic from engaging in self harm or suicide, failed to perform a comprehensive suicide risk assessment, did not provide counseling or group therapy, failed to counsel against placing Palakovic in solitary confinement, ignored Palakovic's symptoms of depression and acknowledgment of suicidal ideation, did not properly monitor Palakovic's medications and only engaged with Palakovic in a "superficial way." *Id.* at 2. Palkaovic [sic] committed suicide while incarcerated in the jail. The *Palakovic* case is completely distinguishable from the case at hand where Plaintiff had a medical need to be housed in a separation cell and admits he told Jail staff he did not have thoughts of self harm or suicide, and did not attempt to harm himself while in the Jail. Further, even if that case was factually in line with this case, it is a district court case from the Western District of Pennsylvania and, therefore, not binding on this Court.

(*Id.* at 4–5.)

Defendants repeat that Plaintiff has not established a violation of his constitutional rights and that they are entitled to qualified immunity. (*Id.* at 6.)

## IV. Plaintiff's Sur-reply

Plaintiff asserts that the right to mental health care "is clearly established 'Black letter law,' recognized repeatedly by the Supreme Court. (Dkt. #44 at 2.) He emphasizes that he spent "about over 800" days in solitary confinement as a pretrial detainee without disciplinary issues, and argues that this should "clearly be considered 'Excessive'" and that "it should 'Shock the conscience' of

the Court itself." (*Id.*) He says he is still receiving psychiatric treatment for the damage inflicted by his time in jail. (*Id.*)

Plaintiff insists that Defendants are not entitled to qualified immunity because of their direct personal knowledge of his suicide attempt, PTSD, and depression, which placed him a "severe risk of suicide." (Dkt. #44 at 2–3.) He responds to Defendants' denial of knowledge that he was suicidal[4] by observing that "they somehow found it 'Reasonable'" to strip Plaintiff and place him on suicide watch immediately after booking, and then to move him to solitary confinement for more than 800 days "without effective mental health care." (*Id.* at 3.) Plaintiff also points to the "chilling effect" against reports of suicidal thoughts posed by the "horrible conditions" of suicide watch and says "[t]o this day the Plaintiff would rather have simply chosen to just commit suicide." (*Id.*)

Plaintiff indicates that the issue is whether "they can keep a pretrial detainee with a previous serious suicide attempt and two major mental health diagnosis [sic] in Solitary 'Indefinitely.'" (*Id.* at 4.) He asserts that the 30-day reviews of his assignment were mere rubber stamps and suggests that Defendants' reliance on his former role as a law enforcement officer is a desperate, post hoc justification for their actions rather than a genuine factor in his placement. (*Id.*) He also purports to quote Defendants on this point:

> The Defendants even claim that there is "No proof he stopped being a law enforcement officer in 2006", yet the Plaintiff has admitted a copy of their own Police report in which Anderson County shot and arrested and convicted him of a felony in June of 2006. Are they somehow claiming he continued work as a law enforcement officer from prison? After? To call this "Disingenuous" is to be overly kind."

---

[4] Plaintiff actually mischaracterizes Defendants' filings on this point. He asserts that "[i]n their latest motion the Defendants make much of the fact that 'The Plaintiff made no claims he was going to kill himself'. And that they were 'unaware of his medical diagnosis.[']" (Dkt. #44 at 3.) None of that quoted language appears in either Defendants' motion or their reply. And while Defendants have asserted the lack of any reported suicidal ideation by Plaintiff in their filings, they have not, for the purposes of the pending motion, denied either the fact or their knowledge of the 2006 shooting incident or Plaintiff's diagnoses.

(*Id.*) But, as with the language discussed in FN4 above, Plaintiff provides no citation for that quoted language, and the Court is unable to locate it in either Defendants' motion or their reply. Nor can the Court detect any suggestion in either document that Defendants dispute the date on which Plaintiff left the police force or that such date is relevant to their motion. To the contrary, the Court understands Defendants' position to be that the amount of time since Plaintiff left law enforcement is immaterial to the fact of his lasting status as a former officer. (*See* Dkt. #43 at 4.)

Plaintiff again emphasizes the seriousness of his "suicide by cop" attempt and Defendants' knowledge of it. (Dkt. #43 at 5–6.) He states:

> There can be no doubt that in this case the "Suicide by cop" attempt was a violent, determined and near successful attempt. And the fact that the Plaintiff was at the time of his arrest in 2016, and is in fact currently, a patient at ACCESS for the very same mental health issues (Severe PTSD and Major Depressive Disorder) which caused this suicide attempt, clearly show that the issue was still ongoing. It will never go away.

(*Id.* at 6.) He says one ACCESS staff member has said he has "the worst case of PTSD [she has] ever seen." (*Id.*)

Plaintiff argues that the *Palakovic* case upon which he relies is directly on point because Defendants here failed to provide counseling or group therapy, allowed him to be placed in solitary confinement, ignored his PTSD and depression symptoms, and provided only "superficial interaction." (Dkt. #44 at 7.) And finally, he argues that his witness affidavits are admissible under four different exceptions to the hearsay rule and suggests that perhaps they "look like hearsay – but aren't." (*Id.* at 8–10.)

**V. Legal Standards**

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (quoting *Celotex*, 477 U.S. at 323–25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts,

or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–51; *Texas Instruments*, 100 F.3d at 1179.

**VI. Discussion and Analysis**

A.  Conditions of Confinement

The State has a recognized interest in detaining defendants for trial and a consequent responsibility to "tend to essentials of their well-being" while they are incarcerated. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996). The State thus owes a duty to pretrial detainees "that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of 'basic human needs.'" *Id.*

Plaintiff repeatedly cites the Eighth Amendment as the basis for his claims. But the Eighth Amendment only applies to convicted prisoners. The constitutional rights of a pretrial detainee such as Plaintiff stem instead from the Fourteenth Amendment. *Hare*, 74 F.3d at 639. Since pretrial detainees have not been convicted of a crime, their conditions of confinement cannot be used as punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Under the Fourteenth Amendment, pretrial

detainees have at least the same amount of protection under the Eighth Amendment as convicted prisoners. *Hare*, 74 F.3d at 639.

The Fifth Circuit has explained the framework for analyzing constitutional claims brought by pretrial detainees:

> We begin by determining whether to classify the challenge as an attack on a "condition of confinement" or an "episodic act or omission." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) (citing *Scott v. Moore*, 114 F.3d 51, at 53 (5th Cir. 1997) (en banc)). For example, when a detainee complains of the number of bunks in a cell or mail privileges that is best characterized as a complaint about general conditions of confinement. *Scott*, 114 F.3d at 53. However, where the complaint is one concerning a particular act or omission by one official it is properly characterized as an "episodic act or omission." *Id.*

*Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000).

In this case, the parties agree that Plaintiff's assignment to a single cell was, at least in part, the result of the lack of electrical outlets in the jail's general population cells and a consequent practice of housing inmates who require CPAP machines in single cells, which are equipped to power them. Defendants also maintain that, as a matter of jail policy, they house any former law enforcement officer in a single cell for his own protection, and they would not permit CPAP machines in general population cells due to the potential safety hazards and disturbances the noise from such machines would cause. As each of these factors involves jail structure or general policy, Plaintiff's claim is properly classified as a "condition of confinement" claim, which is subject to the standards set forth by the Supreme Court in *Bell v. Wolfish*. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996) ("[T]he *Bell* test retains vitality only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement.").

The Supreme Court in *Bell* reiterated the constitutional "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory

restraints that may." *Bell*, 441 U.S. at 537. It went on to explain the analysis involved in making that distinction:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Id.* at 538–39 (internal citations omitted). The government's legitimate objectives in this context include its "legitimate interests that stem from its need to manage the facility in which the individual is detained," including "maintain[ing] security and order" and "effective management" of the facility. *Id.* at 540.

Moreover, the Supreme Court explained that jail officials are entitled to broad deference in determining how best to meet those objectives:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell*, 441 U.S. at 547–48 (internal citations omitted). Accordingly, even if an inmate or a court could conceive of a different or "better" way to meet those objectives, that does not mean that the

government's chosen way is unconstitutional. *Id.* at 542 n.25 ("Governmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional."). The Fifth Circuit has made clear that "this test is deferential to jail rulemaking; it is in essence a rational basis test of the validity of jail rules." *Hare*, 74 F.3d at 646. As long as the aggrieving policy is "not 'imposed for the purpose of punishment,' but instead reasonably relate[s] to a legitimate governmental objective, the policies are constitutional and [the plaintiff's] claims fail." *Dawson v. Bd. of Cnty. Commissioners of Jefferson Cnty., Colorado*, 732 F. App'x 624, 632 (10th Cir. 2018) (quoting *Bell*, 441 U.S. at 538).

Plaintiff complains that his solitary confinement for over two years was unconstitutional. But Defendants have come forward with evidence that there are multiple legitimate interests that led to Plaintiff's being housed in a single cell.

The Court will first address the need to assign Plaintiff to a cell with an electrical outlet for his CPAP machine. First, there is no genuine argument in this case that his assignment to a single cell was done for the purpose of punishing him. Plaintiff alludes to some animosity toward him from Defendant Taylor, but he acknowledges that all inmates who use CPAP machines are housed in single cells and that he used a CPAP machine at the time he was booked into the jail. It is clear that Plaintiff was not personally targeted for placement in a single cell. And there is no reason in this record to believe that Defendants arbitrarily desire to punish all inmates with sleep apnea.

To the contrary, Defendants have established by affidavit testimony—and Plaintiff does not dispute—that the only cells in the Anderson County Jail with electrical outlets are the single cells, such as the one in which he was housed. (Dkt. #39-1 at 3.) This arrangement is far from unique to Anderson County. *See Akins v. Liberty Cnty.*, No. 1:10-CV-328, 2014 WL 105839, at *3 (E.D. Tex. Jan. 9, 2014) (plaintiff "alleged delays in receiving his CPAP machine . . . and being

placed in a solitary confinement cell (which had an electrical outlet for his CPAP machine)"); *Craft v. Burns*, No. 22-CV-119-DWD, 2022 WL 5169390, at *5 (S.D. Ill. Oct. 5, 2022) ("Plaintiff was apparently housed in isolation in the booking area of the Jail for a significant period of time because he needed an electrical outlet for his CPAP machine."); *Rideau v. Ochoa*, No. 10CV0594 IEG PCL, 2010 WL 3733758, at *2 (S.D. Cal. Sept. 16, 2010) (plaintiff seeking electrical access for CPAP "was moved to a double cell by Defendant Ochoa which prevented Plaintiff from being able to use his CPAP machine").

Plaintiff argues that the lack of electricity in general population cells is not a rational explanation because Defendants could have retrofitted a general population cell with electrical outlets. He says saving money was the only reason they did not do so. But Defendants indicate that there are also safety and security concerns associated with electrical equipment in standard cells, and they are not the only jail officials to share that concern:

> Jail command staff . . . were concerned about the potential for Hutchinson or another inmate to use the CPAP machine as a weapon. To avoid that issue, and to accommodate Hutchinson's need to sleep with the CPAP machine, jail command staff . . . decided that Hutchinson should be segregated from the general inmate population. To carry out this decision, these defendants moved Hutchinson to a suicide-watch cell on September 12, 2014, which effectively placed him in solitary confinement.

*Hutchinson v. Cunningham*, No. 2:17-CV-185-WKW-GMB, 2018 WL 1474906, at *3 (M.D. Ala. Jan. 23, 2018) (record citations omitted), *report and recommendation adopted*, No. 2:17-CV-185-WKW, 2018 WL 1474532 (M.D. Ala. Mar. 26, 2018) (granting qualified immunity to sheriff's office defendants); *see also Alfred v. Winn Corr. Ctr.*, No. CIV.A. 07-1785, 2009 WL 1259103, at *2 (W.D. La. May 1, 2009) (observing the "unique safety and resource allocation concerns which accompany use of the CPAP" in a correctional facility).

Furthermore, convenience, expense, and security are all reasonable bases for jail administrators' decisions about how to run their facility, as another district court in this state has explained:

> Once Plaintiff received the CPAP machine, Jail officials transferred him from minimum custody to maximum security. Thus, he was effectively placed in isolation with no access to a phone, television, or dayroom as punishment for his medical condition.
>
> . . .
>
> Plaintiff complains that, after he received the CPAP machine, he was moved to the maximum security area of the Jail where he then lost such privileges as the dayroom, telephone, and television.
>
> In general, classification of inmates is a matter of prison administration and management with which federal courts are reluctant to interfere except in extreme circumstances. *Young v. Wainwright*, 449 F.2d 338, 339 (5th Cir.1971). Prison officials have broad discretion, free from judicial interference, in classifying prisoners in terms of their custodial status. *Jones v. United States*, 534 F.2d 53, 54 (5th Cir.), *cert. denied*, 429 U.S. 978 (1976). Except for some denials of a fundamental right or use of a suspect classification, prison policy can be based on such consideration as administrative convenience, expense or security. *Green v. McKaskle*, 788 F.2d 1116, 1125 (5th Cir.1986).
>
> Here, Plaintiff needed to sleep with a CPAP machine that involved a face mask, an extension cord, and electricity. It is reasonable for Jail officials to determine that Plaintiff needed to be housed in a single cell while utilizing such equipment for security reasons. To the extent Plaintiff lost certain privileges that he otherwise would have enjoyed, he fails to state a cognizable constitutional violation.

*Wilson v. Kleberg Cnty. Jail*, No. 2:15-CV-160, 2015 WL 7730989, at *4–5 (S.D. Tex. July 24, 2015), *report and recommendation adopted as modified*, No. 2:15-CV-160, 2015 WL 7736631 (S.D. Tex. Nov. 30, 2015).

Plaintiff dismisses Defendants' concerns about the potential for inmate disturbances arising from the use of a CPAP in a shared cell while other inmates are trying to sleep. But that concern is also not limited to these Defendants. *Henderson v. Quiros*, No. 3:21-CV-1078 (VAB), 2021 WL 5359739, at *3 (D. Conn. Nov. 17, 2021) ("DOC policy for inmates with sleep apnea allegedly includes the provision of an in-cell CPAP machine, as well as a single cell for sleeping due to the

'well known' conflicts between inmates with sleep apnea and their cellmates."). In fact, at least one CPAP-using inmate has claimed that the Constitution required his jailers to assign him to "a single cell so that he will (i) have sufficient room to use his Continuous Positive Airway Pressure ventilator (CPAP); and (ii) be safe from possible attacks by any cellmate who might be upset by the sound of the CPAP" and "submitted declarations by other prisoners, some of whom declare that in their experience the sound of the CPAP has irritated their cellmates." *Gray v. Bright*, No. 15-CV-03277-RS (PR), 2018 WL 9848289, at *1, *4 (N.D. Cal. Aug. 17, 2018), *aff'd*, 773 F. App'x 986 (9th Cir. 2019). Further, the Court must remain mindful that the administration of the jail and determining what situations are more or less likely to cause inmate disturbances are matters within the expertise of Defendants, not the Court.

Second, the Defendants have filed custody reassessment sheets establishing that Plaintiff was deemed to warrant maximum custody due to his serious offenses. (Dkt. #39-1 at 4; Dkt. #39-4.) On each form, the severity of his current offense is rated 4 (high), and his most serious prior conviction is rated 6 (highest), for a total score of 10. (*E.g.*, Dkt. #39-4 at 1.) The forms instruct that a score of 7 or higher results in automatic placement in maximum custody. (*Id.*) Plaintiff claims that he never saw or participated in the creation of these forms. But that does not render them inaccurate or unreliable or otherwise mean that Defendants were not entitled to implement the scores reflected in them to determine Plaintiff's custody level. And Plaintiff cannot dispute the seriousness of his 2006 crimes. Publicly available records from the Anderson County Criminal Court establish that Plaintiff was convicted in 2007 of crimes including aggravated sexual assault and aggravated assault. *See* Anderson County Register of Actions, Case No. 28931 in the 3rd Judicial District Court, State of Texas v. Finch, James Allen, available at http://pubaccess.co.anderson.tx.us/PublicAccess/CaseDetail.aspx?CaseID=1114493 (last visited

Dec. 11, 2023). And Plaintiff himself has repeatedly highlighted his engagement in a dangerous, armed confrontation with police as part of his alleged attempted "suicide by cop." (*E.g.*, Dkt. #42-3 at 3.) If Defendants determine that such a criminal history warrants a maximum custody placement, it is not the role of the Court to second-guess that assessment.

Finally, Defendants also rely on testimonial proof that the jail has a policy of housing all former law enforcement officers, including Plaintiff, in single cells for their own protection. (Dkt. #39-1 at 5.) Plaintiff questions the sincerity of that explanation because Defendants never mentioned it to him or relied on his prior law enforcement experience in the relevant records. But he does not cite any law obligating Defendants to record multiple bases for Plaintiff's cell assignment. It is a commonly held understanding that former law enforcement officers may be particularly at risk from other inmates in general population, *see Cartwright v. Goodwin*, No. 5:17-CV-1669, 2018 WL 2124915, at *3 (W.D. La. Mar. 28, 2018), *report and recommendation adopted*, No. 5:17-CV-1669, 2018 WL 2123619 (W.D. La. May 8, 2018) (inmate seeking protective custody because of fears for his safety as a former police officer), and *Reaux v. Strain*, No. CIV.A. 10-1230, 2011 WL 3475397, at *6 (E.D. La. Aug. 9, 2011) (inmate suit arising from multiple assaults on former officer in jail), and Plaintiff does not dispute that notion in general. Plaintiff suggests that the sixteen years that had passed since he was a police officer mitigated that risk, but another former officer attacked by a fellow inmate in jail was told "once a cop, always a cop." *Reaux* at *7. And again, it is particularly within Defendants' purview to assess and respond to any security risks in jail.

It is thus clear from the record that Defendants had multiple rational bases for holding Plaintiff in a single cell throughout his incarceration in the Anderson County Jail, any one of which would satisfy the standard set forth in *Bell v. Wolfish*. Of course, *Bell* also instructs that when the

conditions in question "cause [detainees] to endure genuine privations and hardship over an extended period of time [that] might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." *Bell v. Wolfish*, 441 U.S. at 542. But the record in this case establishes that the conditions of Plaintiff's confinement were not that extreme.

Plaintiff was housed in a single cell, as many inmates are. But Defendant Choate has testified that Plaintiff had access to recreation and exercise periods just like the general population inmates. Plaintiff does not dispute that he had some access to recreation, but he has offered conflicting assertions about its extent. He originally complained that he was only offered recreation five times in his first year of incarceration (Dkt. #5 at 11); but in response to Defendants' motion, he says that he was taken to recreation once or twice a week—in a room with frosted windows to allow for natural light—until he effectively refused to go due to low energy. (Dkt. #42 at 17.) The Court, therefore, understands Plaintiff not to refute Defendants' assertion about his *access* to recreation; he simply chose not to participate.

Plaintiff also complains of isolation, but the record establishes that he had access to human interaction. He says that recreation was "usually alone," which indicates that he could participate in recreation with other inmates at times if he chose to. He had a telephone, and his own evidence establishes that he maintained written communication[5] with at least one family member and some type of communication with several others. (*See* Dkt. #42-4 (multiple references to communication with "your mom," "Johnny," and "Aunt Von"; Dkt. #42-5 (reference to letters from "Jessica"); Dkt. #42-6 (reference to communications from "Jessica," "your mom," and "Johnny").) If Plaintiff chose not to use the telephone at his disposal to speak with these individuals, that is not a restriction

---

[5] Defendants have not objected to Plaintiff's submission of these letters, and the Court finds it unnecessary to consider whether they should be excluded because they do not refute any material fact relevant to the pending motion.

that was placed on him by Defendants. It is also undisputed that Plaintiff had the option of regular twenty-minute visits with family members. (Dkt. #5 at 10.)

Plaintiff's letters also indicate that he had regular, supportive interaction with jail staff, whom he considered "some of the best [he had] ever seen," saying they were "really nice" and "really seem[ed] to care." (Dkt. #42-5 at 2.) He wrote that one staff member came and sat with him for some time when he seemed particularly distressed. (*Id.*) And Todd Tatum's affidavit[6] indicates that Defendant Choate would personally "sit with James at nights and try to help him" and that another jailer sometimes did the same. (Dkt. #42-1 at 1.) Thus, despite being in a single cell, Plaintiff had regular interactions with others, both in and outside of jail. He could also watch television, although it was under the control of jai staff (as one might expect in jail), and he has not alleged any limitation on his ability to procure reading material from outside sources.

Accordingly, the conditions experienced by Plaintiff, while undoubtedly unpleasant and unexpectedly prolonged by the pandemic, were not so egregious that they outweigh Defendants' reasonable and legitimate bases for his housing assignment.

B.  Deliberate Indifference

Plaintiff asserts that, even aside from any violation inherent in a prolonged stay in a single cell, holding him in such a cell was particularly unconscionable in light of his psychological condition. The Court understands this claim to be one for deliberate indifference to Plaintiff's serious psychological needs.

The standard applied to a pretrial detainee's claim that jail officials failed to provide necessary healthcare or protect him from harm is one of deliberate indifference. *Hare*, 74 F.3d at

---

[6] Because this affidavit does not dispute any material fact relied upon by Defendants in their motion, the Court finds it unnecessary to resolve the parties' conflict about its admissibility and will allow it to remain in evidence solely for the purpose of the pending motion.

647 ("Since the Supreme Court has consistently adhered to a deliberate indifference standard in measuring convicted prisoners' Eighth Amendment rights to medical care and protection from harm, we adopt a deliberate indifference standard in measuring the corresponding set of due process rights of pretrial detainees."). Neither negligence nor gross negligence is enough to satisfy this standard. *Id.* at 645. Rather, a deliberate indifference claim requires a showing that a defendant official subjectively knew that an inmate faced a substantial risk of serious harm yet disregarded that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

To satisfy the exacting deliberate indifference standard, a plaintiff must show two things: (1) an objective exposure to a substantial risk of serious harm, and (2) that the official acted or failed to act with deliberate indifference to that risk of harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Id.* at 345 n.12. A prison official acts with deliberate indifference if the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official also draws the the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Mere negligence, neglect, or medical malpractice does not rise to the level of a constitutional violation. *See Domino*, 239 F.3d at 756 ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."); *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999) ("[A]llegations of malpractice or negligence will never state a claim under the Eighth Amendment."). Medical records of sick calls, examination, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

The deliberate indifference required to state a constitutional claim "is an extremely high standard to meet," *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001), and officials act with such indifference only if they know an inmate faces a substantial risk of serious harm and they disregard that risk by failing to take reasonable measures to alleviate it. *See Farmer*, 511 U.S. at 837.  Thus, the prison official "must both be aware of the facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference." *Id.* Conclusory allegations are not sufficient to satisfy this standard, and a plaintiff must allege facts to support what are otherwise broad and conclusory allegations of wrongdoing. *See Rougley v. GEO Group*, 2011 WL 7796488, *3 (W.D. La. Nov. 7, 2011).

It is not entirely clear what serious harm is the focus of Plaintiff's deliberate indifference claim. He relies primarily on an unpublished opinion by the United States District Court for the Western District of Pennsylvania, *Palakovic v. Wetzel*, No. CV 3:14-145, 2016 WL 707486 (W.D. Pa. Feb. 22, 2016), *vacated in part*, 854 F.3d 209 (3d Cir. 2017). *Palakovic* concerned whether defendants had failed to take reasonable steps to prevent the suicide of an inmate who had attempted suicide less than a year earlier and reported having suicidal thoughts and a wish to die upon his arrival at the facility. *Id.* at *1–2. Despite knowing this and being "aware of Palakovic's depression, alcohol dependence, anxiety disorder, attention deficit hyperactivity disorder, bipolar disorder, panic disorder, impulse-control disorder, antisocial personality disorder, and history of at least three suicide attempts with suicidal ideation," the defendants "failed to provide mental-health treatment, did not take reasonable measures to prevent Palakovic from engaging in self harm or suicide, failed to perform a comprehensive suicide risk assessment, did not provide counseling or group therapy, failed to counsel against placing Palakovic in solitary confinement, ignored Palakovic's symptoms of depression and acknowledgement of suicidal ideation, did not properly

monitor Palakovic's medications, and only engaged with Palakovic in a 'superficial way.'" *Id.* at *2. Palakovic committed suicide days after his last placement in solitary confinement. *Id.*

As Defendants correctly argue, this case is materially distinguishable from Plaintiff's. At the time of his booking, Plaintiff did not have a recent suicide attempt and did not report any thoughts of suicide or self-harm. However, per the Screening Form for Suicide and Medical/Mental/Developmental Impairments filled out at booking, Plaintiff was automatically placed on suicide watch due to his past suicide attempt. (Dkt. #40-2 at 4.) He was quickly released from suicide watch upon the recommendation of an ACCESS staff member who found him to be exhibiting no unusual behavior or signs of depression. (*Id.* at 2–4.) And there is no allegation or evidence anywhere in this case that Plaintiff at any time thereafter either reported or acted on any thoughts of suicide or self-harm. To the contrary, Plaintiff acknowledges that he chose not to report any suicidal ideation because he did not want to be subjected to the deprivations associated with suicide watch. Accordingly, the record is clear that Defendants did not have any subjective awareness of any risk of suicide by Plaintiff.

Plaintiff may be basing his claim on the risk of the psychological and physical deterioration that he asserts resulted from his prolonged stay in a single cell. He goes to great lengths to establish that Defendants were aware of his depression, PTSD, and past suicide attempt, which they do not dispute. And he argues in the abstract that anyone would know that solitary confinement exacerbates those mental health conditions. But that is not sufficient to establish deliberate indifference by the Defendants.

Plaintiff's complaints of physical deterioration during his incarceration are not supported by the medical records before the Court. But even assuming that such deterioration occurred, there is no evidence that Defendants were subjectively aware that it was the result of his assignment to

a single cell. Plaintiff was severely obese at the time he entered jail, at 5'10" and weighing 325 pounds, and already suffered from hypertension. The Court cannot assume that laymen would necessarily recognize that any progression in Plaintiff's cardiovascular condition or related illnesses would be attributable to the specifics of his confinement. Defendants are not health care providers, and there is nothing to suggest that they were aware of the details of Plaintiff's physical condition or that they subjectively inferred that he was at risk of serious physical harm from his housing assignment. There is no genuine dispute about the fact that, despite his cell assignment, Plaintiff had access to recreation and exercise periods in which he largely chose not to participate. Moreover, there is no allegation or evidence that Plaintiff did not receive constitutionally adequate care and treatment for his physical conditions while in jail, or that Defendants had any role in his medical care whatsoever.

Plaintiff's self-serving complaints of severe psychological deterioration are also not supported by the evidence before the Court. Plaintiff suffered from depression and PTSD when he entered the jail. He was on Prozac, and he was regularly taken to ACCESS mental health providers who continued his treatment with Prozac. He asked to see an ACCESS provider in June 2019, and was evaluated by access that September. (Dkt. #40-1 at 18; Dkt. #40-2 at 16.) As recently as July 2020, he reported the Prozac was helping with his depression and that he was having "no issues with insomnia and no worsening of his symptoms," despite continuing to be depressed due to his long wait in jail for a trial date "due to Covid-19." He never complained of being suicidal or despondent. Only once did he report that his depression had increased "a little" due to his circumstances. But even then, he did not want to change or increase his medication because he was concerned it would cause him to experience dry mouth. Accordingly, to whatever extent Plaintiff's psychological state deteriorated in jail, at least some of it was attributable simply to the

fact that he was in jail for an unexpectedly long time during a pandemic, and it was less unpleasant to him than the alternative of potential dry mouth. There is no dispute in this case that Plaintiff was depressed before he entered the jail, continued to be depressed and to receive treatment for depression while he was in jail, and has remained depressed since his release. But Plaintiff himself characterizes his current condition as a continuation of "the very same mental health issues (Severe PTSD and Major Depressive Disorder) which caused [his 2016] suicide attempt," which "will never go away." (Dkt. #44 at 6.)

Moreover, the record is clear—and Plaintiff does not dispute—that he was receiving treatment for his depression throughout his incarceration, in the form of regular appointments with mental health providers and medication. He seems to fault his jailers for not also providing access to counseling therapy, but to establish deliberate indifference an inmate "must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard'" for the inmate's serious needs. *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). When an inmate is receiving some treatment, the fact that the diagnosis or treatment is "wrong" or ineffective does not make it deliberately indifferent. *Id.* This is especially true for the course of depression, which is "inherently difficult for anyone to predict, particularly in the depressing prison setting." *Id.* (holding that misdiagnosis and resulting failure to treat suicidal inmate was not deliberate indifference). While it is clear that Plaintiff would have preferred additional or "alternative methods of treatment," an inmate's "[d]isagreement with medical treatment does not state a claim" for deliberate indifference. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

Thus, Defendants' awareness that Plaintiff suffered from depression and PTSD alone is not sufficient for Plaintiff to prevail in this suit. They have produced records demonstrating that Plaintiff was receiving treatment for those conditions and that there was never any order or recommendation from his mental health providers that he be provided with counseling or a different housing assignment. Plaintiff does not dispute that he never asked his healthcare providers to prescribe a different housing environment. Defendants have demonstrated that there is no genuine issue of material fact from which a factfinder could conclude that they were subjectively aware of and failed to reasonably respond to any serious need by Plaintiff.

C.  Qualified Immunity

The Defendants have invoked the defense of qualified immunity in their motion for summary judgment. It is thus Plaintiff's burden to show that qualified immunity does not apply in this case. *See Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020). Conclusory allegations are insufficient to overcome the qualified immunity defense. *Williams-Boldware v. Denton County, Texas*, 741 F.3d 635, 643-44 (5th Cir. 2014).

To overcome qualified immunity, a plaintiff must show both that the government official violated a constitutional right and that the right was clearly established at the time of the challenged conduct. *Laviage v. Fite*, 47 F.3d 402, 405 (5th Cir. 2022). The Fifth Circuit has explained the law of qualified immunity as follows:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It protects 'all but the plainly incompetent or those who knowingly violate the law.' *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
>
> Our qualified immunity inquiry is two-pronged. *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020). First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated

39

a constitutional right.  Second, we ask whether the right was 'clearly established.' *Id.* We can analyze the prongs in either order or resolve the case on a single prong. *Id.*

*Cunningham v. Castloo*, 983 F.3d 185, 190–91 (5th Cir. 2020).

The second prong of the analysis is "difficult to satisfy," as the Fifth Circuit went on to explain:

> A right is "clearly established" only if it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11. We must define the right "with specificity." *City of Escondido v. Emmons*, – U.S. –, 139 S. Ct. 500, 503 (2019) (per curiam) (citation and quotation marks omitted). A case "directly on point" is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citation omitted). This rule is a "demanding standard," *Dist. of Columbia v. Wesby*, – U.S. –, 138 S. Ct. 577, 589 (2018) (citation omitted), and the Supreme Court "repeatedly" has told us "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Ultimately, "[t]he dispositive question is whether the violative nature of the particular conduct is clearly established." *Mullenix*, 577 U.S. at 12 (citation omitted). We undertake that inquiry "'in [the] light of the specific context of the case, not as a broad general proposition.'" *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

*Id.* at 191.

As discussed above, the Court finds that Defendants have carried their burden of demonstrating that there is no genuine issue of material fact from which a jury could find they violated Plaintiff's constitutional rights in this case. But even assuming a violation could be found, Plaintiff has failed to meet his burden of overcoming the qualified immunity defense, because he has not presented competent summary judgment evidence showing that the Defendants violated a clearly established constitutional right.  While there is no doubt that in general terms, the right to be free from irrationally punitive pre-trial conditions or deliberate indifference to serious medical or psychological needs was clearly established at the time of Plaintiff's detention, the

uncontroverted summary judgment evidence does not show that any reasonable jail official would have known that Defendants' conduct in this case violated that right.

Plaintiff's claim in essence is that the prolonged solitary confinement of an inmate with known psychological problems is inherently unconstitutional. But, as discussed above, the case on which he relies is materially distinguishable, and it is not an opinion with which a reasonable jail official in Texas would necessarily be familiar. *See Palakovic v. Wetzel*, No. CV 3:14-145, 2016 WL 707486 (W.D. Pa. Feb. 22, 2016). It certainly does not stand for the proposition that solitary confinement of a pretrial detainee, even a psychologically fragile detainee, is unconstitutional regardless of the reasons for the confinement.

Solitary confinement is severe but not uncommon; "It is estimated that 25,000 inmates in the United States are currently serving their sentence in whole or substantial part in solitary confinement, many regardless of their conduct in prison." *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring). It has long been the law in this circuit that "[s]olitary confinement is not per se unconstitutional." *Lumpkin v. Kaufman Cnty. Sheriff's Off.*, No. 3:21-CV-1842-N (BH), 2023 WL 3046354, at *10 (N.D. Tex. Mar. 15, 2023), *report and recommendation adopted*, No. 3:21-CV-1842-N (BH), 2023 WL 3047396 (N.D. Tex. Apr. 21, 2023) (citing *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974)); *see also Regalado v. City of Edinburg*, No. 7:22-CV-228, 2023 WL 2394299, at *24 (S.D. Tex. Feb. 1, 2023), *report and recommendation adopted*, No. 7:22-CV-228, 2023 WL 2391014 (S.D. Tex. Mar. 7, 2023) ("[T]he 'common practice to house inmates with alleged mental health problems in solitary confinement, strip them naked or down to their underwear, and that the extremely cold conditions in these cells are worse than in other holding cells' does not rise to level of a constitutional violation."). "[T]he Fifth Circuit has held that, regardless of whether a prisoner is a pretrial detainee or a convicted prisoner, solitary confinement

will not rise to the level of a constitutional deprivation unless extraordinary circumstances are demonstrated." *Gonzales v. Lopez*, No. CIV.A. C-08-008, 2008 WL 724247, at *5 (S.D. Tex. Mar. 17, 2008) (citing *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir. 1996)) (finding claim based on detainee's solitary confinement to be without merit where plaintiff was deemed a security risk based on his criminal charge).

National caselaw further supports the general proposition that "segregating a pretrial detainee for reasons related to legitimate governmental objectives does not amount to punishment in violation of the detainee's due process rights." *Shuler v. Hall*, No. 3:18-CV-01223, 2019 WL 1777899, at *3 (M.D. Tenn. Apr. 23, 2019) (citing *Martucci v. Johnson*, 944 F.2d 291, 294 (6th Cir. 1991)). And even when the sheer length of a detainee's solitary confinement appears punitive, the facts might establish that it is "an incident of a legitimate nonpunitive governmental objective." *Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 130 (2d Cir. 1991) (remanding for district court to determine whether detainee's 9-month solitary confinement was for legitimate, nonpunitive reasons); see also *Shuler v. Hall*, No. 3:18-CV-01223, 2020 WL 832226, at *5 (M.D. Tenn. Jan. 31, 2020), *report and recommendation adopted*, No. 3:18-CV-01223, 2020 WL 819516 (M.D. Tenn. Feb. 18, 2020) (granting judgment on the pleadings to defendants where detainee's 6-month solitary confinement was related to need to preserve internal order and discipline after his confrontation with two officers).

Solitary confinement is undoubtedly harsh, and a detainee's Fourteenth Amendment claim based on such confinement may have merit where "the record fails to establish that [the detainee's] segregation was motivated by a 'legitimate objective,'" and the potentially rational reasons for such confinement were "mere speculation." *Martinez v. Harris Cnty. Jail*, 71 F.3d 876, 1995 WL 725414, at *2 and n.6 (5th Cir. 1995) (vacating dismissal and remanding for further proceedings

where there was no sworn testimony or other evidence providing explanation for detainee's segregation). It has been held to be clearly established that holding a detainee "in solitary confinement for 500 days for no legitimate purpose and without any periodic review violated his constitutional rights." *Magluta v. Samples*, 375 F.3d 1269, 1283 (11th Cir. 2004). Similarly, a grant of qualified immunity would be "inappropriately awarded" where there remained a genuine issue of material fact regarding whether a detainee's prolonged solitary confinement constituted punishment or was "related to a nonpunitive purpose." *Williamson v. Stirling*, 912 F.3d 154, 185, 187 (4th Cir. 2018).

But in this case, no such genuine issue remains. Defendants have produced reliable evidence of several legitimate, nonpunitive reasons for Plaintiff's cell assignment: his need for an electrical outlet for his CPAP machine, the need to prevent CPAP machines and their cords from disturbing or endangering other inmates, the seriousness of Plaintiff's criminal history, and the need to separate former law enforcement officers from general population inmates. They have also proven that Plaintiff's cell assignment was reviewed on a monthly basis. In response, Plaintiff concedes that all CPAP-users in the jail are housed in the same area. And although he disagrees about the risks involved in placing him in the general population—either due to his CPAP use, his criminal history, or his status as a former law enforcement officer—those are considerations that properly fall within the broad discretion of jail officials and in which the judiciary lacks the expertise to interfere. Plaintiff has not cited, and the Court is unable to find, any law clearly establishing that segregating a detainee for any or all of those reasons and under those circumstances is unconstitutional.

In 2015, Justice Kennedy observed that there was "a new and growing awareness in the broader public" of the use and effects of solitary confinement and that a case might arise in which

"the judiciary may be required . . . to determine whether workable alternative systems for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them." *Davis*, 576 U.S. at 289–90 (Kennedy, J., concurring). But Plaintiff has not demonstrated that this "new and growing" concern had reached the point of clearly establishing that his conditions of confinement in 2018–2020 were unconstitutional. Even if the constitutionality of Defendants' actions in this case were debatable, the matter is not "beyond debate" as required to overcome their claim of qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Defendants are thus entitled to qualified immunity from this suit.

<u>RECOMMENDATION</u>

Accordingly, the undersigned recommends that Defendants' motion for summary judgment (Dkt. #39) be granted and that judgment enter in favor of Defendants.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 12th day of January, 2024.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE